HICKS BODY COMPANY, Inc., a corporation, Appellant,

v.

WARD BODY WORKS, Inc., Appellee.

No. 15316.

United States Court of Appeals
Eighth Circuit.

May 11, 1956.

Wendell J. Brown, Chicago, Ill. (Edward L. Wright, Little Rock, Ark., Russell I. Richardson, Stewart & Richardson, Lebanon, Ind., MacLeish, Spray, Price & Underwood, Chicago, Ill., and Wright, Harrison, Lindsey & Upton, Little Rock, Ark., with him on the brief), for appellant.

J. G. Williamson and J. W. Barron, Little Rock, Ark. (Rose, Meek, House, Barron & Nash, Little Rock, Ark., with them on the brief), for appellee.

Before WOODROUGH, JOHNSEN and VOGEL, Circuit Judges.

JOHNSEN, Circuit Judge.

Appellant, an Indiana corporation, brought suit against appellee, an Arkansas corporation, in the federal court in Arkansas, on diversity jurisdiction, to recover damages for breach of a contract. The court, on motion of appellee, dismissed the action, upon the grounds that the contract was one which had been made in Arkansas; that appellant had not qualified as a foreign corporation to do business in the State; and that under the Arkansas statutes it therefore was without right or capacity to sue upon such a contract in the State.

Ark.Stats.Ann.1947, § 64–1201, requires a foreign corporation doing business in the State to make certain filings in the office of the Secretary of State, including a copy of its charter, articles, or certificate of incorporation, the name of an agent upon whom process against it can be served, and a resolution by its Board of Directors consenting that service upon any agent which it may have in the State, or upon the Secretary of State (provision being made in the statute for the immediate forwarding by such officer to the corporation's principal office of any process served upon him), shall constitute valid service upon it.

Section 64–1202 provides that "Any foreign corporation which shall fail to

comply with the provisions of this act * * *, and shall do any business in this State, shall be subject to a fine of not less than $1,000, * * * *and as an additional penalty, any foreign corporation which shall fail or refuse to file its articles of incorporation or certificate as aforesaid, can not make any contract in this State which can be enforced by it either in law or in equity,* and the complying with the provisions of this act after the date of any such contract, or after any suit is instituted thereon, shall in no way validate said contract." (Emphasis supplied.)

Appellant contends that § 64-1202, which originally was Act 687 of Arkansas Acts of 1919, was repealed by implication, in the enactment of Act 131 of the Acts of 1947, now §§ 64-1204 to 64-1209, Ark. Stats.Ann.1947. The 1947 Act was in form an independent act, without any specific expression of amendment or repeal of § 64-1202. It made a foreign corporation doing business in the State, "which fails to file in the office of the Secretary of State a copy of its charter or Articles of Incorporation as now provided by law", subject to a "penalty" of $5,000—for which failure § 64-1202 had provided a $1,000 "fine". Nothing was, however, said in the 1947 Act about any lack of capacity on the part of such a non-complying corporation to enforce a contract made in the State, which disability § 64-1202 had, as previously indicated, imposed upon the corporation "as an additional penalty". It is argued here that, although the 1947 Act did not expressly repeal § 64-1202, the Legislature must have intended that the new, increased, monetary penalty, for which the Act provided, should take the place of all previous penalties in the statute, and that thus, not only had the $1,000 fine under § 64-1202 been superseded, but equally had the disability of a non-complying foreign corporation to enforce in the courts of Arkansas its contracts made in that State been terminated.

The trial court was of the view, in effect, that, in its adoption of the 1947 Act, the Legislature was primarily acting to stop, by emergency measure, the substantial revenue loss, which it believed had been occurring, from the disregard by foreign corporations of the requirement of qualifying to do business in the State, and was not assuming to examine or canvass generally the field of existing, consistent penalties; that the prescribing of a $5,000 penalty, in order to force foreign corporations to qualify to do business in the State, did not realistically tend to persuade of any legislative intent to deal more leniently with such an offending corporation than formerly in other respects, such as a relenting upon and a lifting of the additional, long-established, important and non-conflicting penalty, under § 64-1202, of lack of capacity to enforce any contract made by it in the State; that the previous imposing of this suit disability in relaton to such contracts involved an aspect of public policy going beyond revenue concern alone, in that it also served the purpose of protecting the citizens of Arkansas from being subject to being sued on such contracts in the State, when the corporation had not seen fit to make it equally as possible and convenient for them to sue it there, through the means which qualification under the statute would provide; that this policy of required, assured, enforcement opportunity in favor of Arkansas citizens on all contracts of foreign corporations made in the State, through statutory qualification, was one which had had continuous legislative existence in the State and been accorded general recognition by its courts, ever since 1887; and that it thus did not seem either convincing or probable that the Legislature had intended to wipe out such a distinct, long-established and important public policy, without any direct expression in relation to it or even mention of the statute containing it, and especially when the remaining-in-effect of the policy could in no possible way be thwartive or affective of the provisions or operation of the adopted, emergency Act.

We do not feel able to say, on any demonstrable legal basis, or as a matter

of general judicial conviction otherwise, that this considered appraisal and application by the trial judge of Arkansas law is an erroneous one in the situation. To the contrary, it seems to us that the court's conclusion is here even more than an allowable one; it is a fully persuasive one as well. Support for the court's concept of the intent and scope of the 1947 Act is contained in the recitation of its emergency clause that "many foreign corporations are now doing business in this State without filing their Articles of Incorporation with the Secretary of State; and * * * much revenue is being lost to the State due to the tax evasion of these corporations", and that "an emergency is hereby declared to exist". It may be noted too that, in furtherance of its purpose to prevent this revenue loss from continuing, the Act sought to effect greater enforcement certainty against violation than in the past, by giving the Attorney General of the State authority to collect the penalty—a power which had previously existed only in the Prosecuting Attorneys of the local Districts—and by further granting the right to make compromises of the penalty, apparently as an aid and as an encouragement to collection efforts, and presumably also as a lever to induce on the part of such corporations a willingness to engage in immediate qualification.

The general principles by which the trial court legally was entitled to evaluate the situation may briefly be recounted. Courts will not unnecessarily regard a statute as repealing another by implication; "whether a new act works an implied repeal of an existing statute is one of legislative intention in the enactment of the alleged repealing act"; "a repeal by implication will be carried no further than is required to gratify the legislative intent manifested in the later act"; "except where an act covers the entire subject matter of earlier legislation, is complete in itself, and is evidently intended to supersede the prior legislation on the subject, a later act does not

by implication repeal an earlier act unless there is such a * * * manifest * * * and irreconcilable inconsistency and repugnancy; that the two acts cannot, by a fair and reasonable construction, be reconciled * * * and be given effect or enforced together"; "a statute is only repealed by the repugnancy of matter in a subsequent statute to the extent of such repugnancy, and if any part of the earlier act can stand as not superseded or affected by the later act, it is not repealed"; and "the principle that the law does not favor repeal by implication is of special application in the case of an important public [policy] statute of long standing * * *." 50 Am.Jur., Statutes, §§ 535, 543, 546. These principles appear to have been duly recognized by the Arkansas Supreme Court in such cases as Moncus v. Raines, 210 Ark. 30, 194 S.W.2d 1, and others which need not here be enumerated.

Appellant makes the further contention, however, that even if the disability of a non-complying foreign corporation to sue in Arkansas upon a contract made in the State still exists under § 64–1202, the contract here involved could not properly be held to be one which in spirit was or could have been intended by the Legislature to fall within the operation of the statute. The argument made in support of the contention is that the negotiations for the contract were all conducted in Indiana and the meeting of the parties' minds subjectively occurred in that State; that the instrument reflective of the understanding so reached was itself drawn up in Indiana and the parties sufficiently executed it there to give it legal operativeness as an obligation on the part of appellee; and that beyond all this appellant could not in any event be said, even if the execution must be regarded as having been completed formally in Arkansas, to have at the time been or to have subsequently become engaged in doing any business in Arkansas, to which the contract could be claimed to be incident, and hence the contract was not one that was violative of the statute as

having been made in relation to or for the purpose of a doing of business in the State.

There is no dispute that the negotiations leading to the formulation of the instrument which the parties intended should be signed, and the drafting of the instrument itself, took place in Indiana. Appellant prepared the instrument and drew it to bear the signatures of both the president and the secretary-treasurer of appellee and of its own such officers, as representing the form of execution to be engaged in by each corporation to complete the instrument. Appellant's president and secretary-treasurer thereafter so placed their signatures upon it in Indiana.

It is true that there was showing on behalf of appellant that appellee's president had similarly placed his signature upon it at the same time and place, and contrary showing by appellee that its president had not signed until after he had returned to Arkansas, where he took the instrument for signing also by the secretary-treasurer of the corporation. But whether appellee's president attached his signature in Indiana or not, he admittedly was given and retained possession and control of the instrument, until there also had been an execution of it by the secretary-treasurer; the instrument intendedly, so far as both parties were concerned, was carried by him to Arkansas and was executed by appellee's secretary-treasurer there; this form of signing was what appellant had made the instrument provide for, as constituting the execution necessary or desired by it on the part of appellee in the particular situation; and it was only after such execution or completion that appellee turned the instrument over to appellant as its formal obligation, with both the secretary-treasurer's signing and the delivery of the instrument to appellant having occurred in the State of Arkansas.

In this situation, there was no occasion legally for the trial court to accord appellant a trial on whether appellee's president had signed the instrument in Indiana or in Arkansas, and whether, if he had in fact signed in Indiana, his signature alone might otherwise have been capable generally of binding the corporation, so that the signature of the secretary-treasurer in Arkansas would not, except for the agreement of the parties, have been necessary. It does not matter here what other form or scope of execution it might have been legally possible for the parties to have engaged in or to have agreed upon to complete their contract. They could choose any legally competent form of execution that they desired to make the written contract binding on the part of the corporation. But having chosen a particular form of execution for their purpose; having given that form legal significance by integrating it into the written instrument; having thereafter adhered to the requirement in the execution engaged in; and having left the matter of delivery of the instrument to be controlled thereby—it could make no difference in the situation whether the signature of appellee's president alone might in general have been sufficient to bind the corporation, had the parties not agreed that execution by the corporation should take the form of a signing by both its president and its secretary-treasurer.

Turning to the principles that control the effect of the parties' agreement as to execution and the carrying out of their requirement, a contract legally is regarded as having been made "at the time when the last act necessary for its formation is done, and at the place where that final act is done." Restatement, Contracts, § 74. Under Arkansas law, "a written contract acquires no validity until delivery, either actual or constructive." Democrat Printing & Lithographing Co. v. Parker, 192 Ark. 989, 96 S.W.2d 16, 18. And whenever a contract is intended by the parties to be, or—as in Arkansas—is legally capable of becoming, effective only upon its delivery, "the place of contracting is where the delivery is made." Restatement, Conflict of Laws, § 312.

Since the last act of signing or execution necessary to complete the writ-

ten instrument, as intended by the parties, and delivery of the completed instrument to appellant as an effective obligation pursuant thereto, both occurred in Arkansas, that State necessarily was the place of contracting or, in other words, the contract was in legal concept and for legal purposes one that had been made in the State of Arkansas.

■ We think that the trial court legally was entitled to regard this "place of contracting" test, as so long recognized and applied in the field of contract law, as having been intended by the Legislature to be controlling of the significance of the term "make any contract", in its use in § 64–1202. As a matter of fact, there would seem to be no other general test under which it would be possible practicably for a court to apply the provision of the statute.

■ Also, in this connection, it may be observed that the situation under the statute is not one of a contract so made by a non-qualified corporation being legislatively declared to be void; the statute merely leaves the corporation without the right or capacity to enforce such a contract in the courts of the State. Miellmier v. Toledo Scales Co., 128 Ark. 211, 193 S.W. 497, 498; State Mut. Fire Ins. Ass'n v. Brinkley Stave & Heading Co., 61 Ark. 1, 31 S.W. 157, 29 L.R.A. 712; Waxahachie Medicine Co. v. Daly, 122 Ark. 451, 183 S.W. 741; J. R. Watkins Medical Co. v. Martin, 132 Ark. 108, 200 S.W. 283, 2 A.L.R. 1230; Ockenfels v. Boyd, 8 Cir., 297 F. 614.[1] Thus, whatever question, if any, might be capable of existing as to the right to declare a contract invalid against a foreign corporation, from a signing alone by the other party having occurred within the State, is not here a matter of concern.

■ And, since Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, any such disability on the part of a non-complying foreign corporation to make use of a remedy existing under state law must, of course, be recognized by a federal court in its exercise of diversity jurisdiction. Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524.

It may possibly be that the Arkansas Supreme Court would hold that the statute, notwithstanding its unqualified language, does not, for purposes of the right to sue in the Arkansas courts, have application to contracts which, though made in the State with citizens of Arkansas, are to be performed wholly outside the State, but that it has application only to contracts so made which are to have performance, or some measure of it, within the State of Arkansas. But this would not help appellant here, for, on the face of the instrument and the undisputed facts of the situation, it is clear that substantial performance under the contract on the part of appellant—and most, if not all of it, on the part of appellee—was intended to occur in Arkansas. Not only had the contract itself, as stated, contemplated such performance under it in Arkansas, but appellant immediately proceeded so to use it and to engage in such measure of activities in the State pursuant to the contract relationship and the effecting of its purpose, as to leave no room for any contention here that the trial court was not entitled to hold as a matter of law that the contract was one which was intended to constitute a basis for, and which had had the result of, appellant doing business in the State of Arkansas.

On that question, the facts which follow are without controversy. Appellant had for many years been engaged in the manufacture and sale of school-bus bodies at Lebanon, Indiana. Appellee was engaged in a similar enterprise at Conway, Arkansas. Appellant had for some time been considering moving its plant to a southern state, because of the labor situation existing in the geographi-

---

[1.] The statute earlier had provided that compliance with the requirement for qualification "after suit is instituted shall in no way validate said contract." Acts 1907, No. 313, § 2. Later this was changed to read "after the date of any such contract, or after any suit is instituted thereon" etc.

cal area where it was located. When it learned that appellee was constructing a new plant and making enlargement of its production facilities at Conway, it entered into negotiations with appellee to have the latter manufacture its school bus bodies for it there, under its own design, specifications and brand, for sale and distribution by it, as before, to its agents and other customers, the same as if the bodies had been continued to be manufactured by itself. The negotiations in which the parties had engaged resulted in the making of the contract which is here involved.

Under the contract, appellee was thus to manufacture for appellant "12,000 buses as ordered"—it being shown that the parties anticipated that this probably would involve a period of 8 to 10 years. Appellee was to take over all of the dies, jigs, machines, and other equipment, which appellant had been using in the manufacture of its bodies, at a price of $36,000, which was to be paid to appellant on the basis of "$3.00 per bus", as manufacture and delivery of the 12,000 buses proceeded. Appellant's inventory, which it had on hand, was also to be taken over by appellee at the cost of the materials to appellant, with payment to be made therefor through the course of the relationship on the basis of "the amount (of such material) actually used in each body". Appellant was to have the right to inspect the bodies for quality and workmanship, before acceptance of delivery. Appellant was to pay to appellee, for manufacturing the bodies, the net price which appellee was at the time charging its distributors for its own bus bodies, with any change in such production price to be the subject of determination and agreement between the parties on the basis of actual expenses and reasonable profit allowance to appellee. Appellant was to pay for any changes in tooling and engineering necessary to be done throughout the period of the contract, and, in prospective aspect, "any future assembly operations * * * shall be agreed on by both parties."

The contract thus manifestly was intended to and necessarily would involve more between the parties, in the relations and processes which were to attend its operation in Arkansas, than a placing of orders by appellant and the making of deliveries by appellee. And the intent to have the attending incidents of the relationship occur as matters of local happening was confirmed and demonstrated by the manner in which the parties proceeded to carry out the contract, which was by having appellant's president immediately come to Conway, giving him office space at appellee's plant, and with him continuing to remain there through all of the one-year's time that appellee produced bodies for appellant, before appellee repudiated the contract and refused to go further. His primary purpose in thus being at the Arkansas plant, as stated by himself, "was to assist in the production and expedite delivery of buses that were to be built * * * for our Company." He kept track of and billed appellee there for such part of the inventory agreed to be purchased by appellee as was from time to time used. He audited and made adjustments of the invoices submitted by appellee for repairs, extras, etc. He made inspections of the bodies as they were being produced and prepared and submitted memorandums to appellee of any defects and other objections. He made computation of and checked with appellee the amount which was due for each body produced. He worked out with appellee's foreman the schedule of production necessary for each received order of bodies that he placed with appellee.

He opened up an account in appellant's name at a bank in Conway, as a facility for handling the financial incidents involved in the dealings between the parties in the production of the bus bodies. During the year's time that the contract was in operation between the parties, before appellee's repudiation of it, he made payments at Conway to appellee out of this account in an amount exceeding $300,000. He established a post office

488

address at Conway for the corporation, and received there a substantial amount of mail relating to its business affairs. This included orders for bodies sent by distributors to Conway, instead of, as previously, to Lebanon. He had printed at Conway 50,000 pieces of sales literature, listing Conway, Arkansas, as one of appellant's business addresses. He looked after the channeling or effecting of deliveries from Conway of the completed bus bodies, at times having some of appellant's employees from Lebanon pick up bodies which had been ordered by individual dealers, and at other times calling upon appellee to make such deliveries to dealers for appellant, paying appellee for the service.

All these things manifestly constituted the doing of a substantial number and variety of business acts by appellant in the State of Arkansas. And they represented aggregately a material portion of the activities necessary to the carrying on of appellant's business, under the form in which it had chosen, by the making of the contract, to conduct its enterprise. In fact, appellant's stationing and keeping of its president at Conway, its establishment there of a mailing address for general business purposes, and its maintaining there of a local bank account as an adjunct to the things which it was doing and having done for it at Conway—with there being involved in the set-up which it had so established the allowing of orders from dealers and other correspondence to be sent directly to it there; the enabling of orders to be placed and schedulings of production to be arranged by it immediately at the plant; the making possible and the engaging in personal supervision by it of the processes of manufacture used in the filling of its orders; the affording of opportunity for inspection as a basis for making acceptance or rejection of the bodies at Conway; the taking care of any matters of adjustment arising in the parties' relations under the contract; the looking after the effecting of delivery from Conway of the completed and accepted

bodies to appellant's customers and distributors; and the cleaning up of appellant's obligations as they accrued in the course of and by virtue of the operation of the contract—would, in our opinion, from the nature, scope, continuity and consequence of the things done, amount practicably or be legally akin to the maintaining of a subsidiary or branch office by appellant at Conway. Cf. Sunlight Produce Co. v. State, 183 Ark. 64, 35 S.W.2d 342.

The activities which have been detailed further plainly leave no room to contend, as appellant here does, that the situation was one of such transiency and negligibleness of local incident as to lack real domestic aspect and significance in relation to the Arkansas statute and to entitle it to be viewed merely as an integral part of interstate commerce. The fact that the things done at Conway had a relationship to or contributed to interstate commerce would not prevent them from constituting also, on the basis of local situs, local stature and local effect, such as was here involved, the doing of Arkansas business. American Manufacturing Co. v. City of St. Louis, 250 U.S. 459, 39 S.Ct. 522, 63 L.Ed. 1084; 20 C.J.S., Corporations, § 1840. The cases cited by appellant, in its attempt to have us hold that interstate commerce alone was involved and that the Arkansas statute therefore had no application—cases such as Simmons Burks Clothing Co. v. Linton, 90 Ark. 73, 117 S.W. 775; Sillin v. Hessig-Ellis Drug Co., 181 Ark. 386, 26 S.W.2d 122; and Murray Tool & Supply Co. v. State, 203 Ark. 874, 159 S.W. 2d 71—do not approach the elements of the present situation and are in no way in conflict with the trial court's holding that appellant's acts under the contract amounted to such a doing of business by it in Arkansas as to be within the purview and purpose of the Arkansas statutes.

There remains the final contention of appellant that, if its acts amounted to a doing of business in Arkansas, and if, by virtue of its failure to comply with

the statute, it was without capacity to maintain a suit upon the contract in that State, it could not under the statute be denied the right to recoupment, on quantum meruit or in restitution, for such enrichment as had resulted to appellee, from thus having acquired and retained appellant's manufacturing equipment. In this connection it asserts in its brief that the equipment had a value many times exceeding the price which appellee was to have paid for it under the operation of the contract.

The trial court was of the opinion that the Arkansas statute was as much designed to prevent a non-complying corporation from seeking restitution as to matters resulting from the contract as to deprive it of the right to have the contract itself enforced in law or equity. The court, however, in its memorandum opinion, spoke of the contract as being "void".

We read the Arkansas cases, as we have indicated, to hold prevailingly that a contract made in Arkansas by a non-qualifying foreign corporation, involving the doing of business in that State, is not as such an illegal bargain but is merely an obligation on which the corporation will not be permitted to bring suit in the State. Thus, in Woolfort v. Dixie Cotton Oil Co., 77 Ark. 203, 91 S.W. 306, 307, the Arkansas Supreme Court, quoting with approval from a New Jersey decision, said: " 'The tendency of judicial decisions on this subject, where the statute does not declare the contract to be void, is to a strict construction, maintaining the validity of the contract and holding that the only effect of such legislation in the state where it is enacted is to impose the prescribed penalties and the expressed disabilities.' "

The Arkansas Legislature has re-enacted the statute a number of times since this interpretation of the language used was first made by the Arkansas Supreme Court, but it has never seen fit to change the expression so as to declare such a contract to be void.

It is true that the opinion in Republic Power & Service Co. v. Gus Blass Co., 165 Ark. 163, 263 S.W. 785, 787, uses the words "absolutely void" in referring to such a contract, but as we pointed out in Brace v. Gauger-Korsmo Const. Co., 8 Cir., 36 F.2d 661, 663, in not regarding the expression of that case as intended to change the Court's previous, specific holdings on the question and the law which thereby clearly had been established, "It is observed that this case makes no mention of the prior decisions in Arkansas, and does not purport to overrule them * * *." The Arkansas Supreme Court has not since the Brace case said anything which suggests, and nothing that has been urged before us tends otherwise to persuade, that the appraisal which we made in the Brace case was erroneous.

Unless the statute was intended to make such contracts void, so that foreign corporations could not sue upon them either in Arkansas or in another State (where it might be possible to obtain service) and so that Arkansas citizens also could not ask to have them enforced against the corporation, there is no basis to regard the contract here as constituting an "illegal bargain", in the sense of being within the application of the general rule that "A party to an illegal bargain can neither recover damages for breach thereof nor, by rescinding the bargain, recover the performance that he has rendered thereunder or its value * * *". Restatement, Contracts, § 598.

In the early case of Spearman v. City of Texarkana, 58 Ark. 348, 24 S.W. 883, 884, 22 L.R.A. 855, the Court had declared the test, as to the right to recover on quantum meruit or in restitution in relation to a contractual transaction, to be, not simply whether the contract was in some way violative of a statute, but whether "the thing contracted for is itself against public policy."

In Smith v. Dandridge, 98 Ark. 38, 135 S.W. 800, 802, 34 L.R.A.,N.S., 129, where a director of a school district had

made a contract with the district, under which, in violation of the statute, he was employed and was to be paid to supervise the erection of a school building, the Court said: "As a director of the school district, he could not make a binding contract with it in which he was individually interested. * * * His right to receive compensation from the school district is not based on the contract, but it is grounded solely on the principle that he had rendered necessary services from which the school district has received real benefits and therefore should recover what those services are fairly and reasonably worth."

In later cases, however, such as Tallman v. Lewis, 124 Ark. 6, 186 S.W. 296, and Carter v. Bradley County Road Imp. Dist. Nos. 1 & 2, 155 Ark. 288, 246 S.W. 9, the Court became convinced that the Legislature had meant that such official-interest contracts, as in the Dandridge case, supra, were to be regarded as not just constituting a matter of statutory violation but as being absolutely prohibited from being the subject of valid transaction. In other words, within the language of the Spearman case, supra, "the thing contracted for [the obtaining of personal benefits in such a situation by a public officer] is itself against public policy."

But what we have said only emphasizes and leaves controlling the view taken by us in the Brace case, supra, that, under the decisions of the Arkansas Supreme Court, the statutory provision here involved was not intended to make a contract by a non-qualifying foreign corporation, entered into in the State, absolutely void, but merely subject to a disability on the part of the corporation to maintain a suit upon it, as a

contract, in the courts of Arkansas. Appellant thus would be in a position to make a rescission of the contract, if it chooses, upon the basis of appellee's repudiation of it, and so to seek restitution from appellee of the machinery and equipment which it turned over, or the value thereof, in case appellee wrongfully is not in a position to make proper restoration, having regard, however, for the use which appellee was entitled to make of it in the bodies actually produced for appellant under the contract.[2]

We need not here, however, consider the question of restitution further. Since, as we have held, the contract is not void, and since appellant is here asserting and standing upon the obligation of the contract, the situation is without basis for the question of restitution to be presently involved. Until appellant shall have elected to rescind the contract, so as not to leave it any basis for a suit against appellee thereon in another State, it is without any possible right to restitution. When it makes such an election and releases appellee from the obligation of the contract, it can have its right to restitution determined. There is no need to keep the present suit open to allow it to make up its mind and to enable it to file an amended complaint, should it decide to permit the contract to be rescinded. All that it is entitled to have done now is to have it declared that the dismissal made by the trial court of its suit will be without prejudice to its right of election to make rescission of the contract and to institute action for whatever restitution it may legally be entitled to claim.

With this qualification upon the effect of the trial court's dismissal, the judgment is affirmed.

2. Incidentally, appellee states in its brief that it offered at the time of its repudiation of the contract to return the machinery and equipment to appellant.