**PELLERIN LAUNDRY MACHINERY SALES COMPANY, Inc., Plaintiff,**

v.

**Vernon HOGUE, Defendant.**

Civ. A. No. 890.

United States District Court
W. D. Arkansas,
Hot Springs Division.
July 12, 1963.

G. Thomas Eisele, Little Rock, Ark., Wootton, Land & Matthews, Hot Springs, Ark., for plaintiff.

Marshall N. Carlisle, Little Rock, Ark., Henry M. Britt, Hot Springs, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

On November 2, 1962, plaintiff filed its complaint against defendant in which it alleged that the defendant is indebted to it in the sum of $87,186.60, "for which it is entitled to have judgment; that demand has been made therefor and payment refused." In numbered paragraph 3 the plaintiff alleged that on August 20, 1958, defendant executed and delivered to plaintiff his negotiable promissory note in the sum of $49,616.87 "evidencing the purchase of the property described in Exhibit 'A', and that there is presently due and owing on said indebtedness the sum of * * * $52,471.-50, which said indebtedness is now due and payable * * *. That said indebtedness was given in connection with the purchase of certain personal property, an itemized list of which is hereto attached and that the plaintiff is entitled to have said personal property sold by a commissioner of this court and the proceeds applied upon said indebtedness."

In paragraph 4 a similar allegation is made with reference to a note executed by defendant on August 8, 1958, in the sum of $14,949.43, and that, "Said note was given for the purchase of certain personal property as herein set forth as evidenced by Exhibit 'B' hereto attached and made a part hereof, and that the plaintiff is entitled to have judgment for said amount, and that the personal property be sold by a commissioner appointed by this court and the proceeds credited upon said indebtedness."

In paragraph 5 it is alleged that on August 20, 1958, the defendant executed his negotiable promissory note in the sum of $17,793.75 payable in monthly installments of $296.56, and that under the terms of the agreement, plaintiff sold and delivered to defendant certain personal property listed in Exhibit "C". "That title to the aforesaid property was retained in the vendor, plaintiff herein, until the entire indebtedness was paid, and that there is now due and owing on said indebtedness the sum of $18,012.80 for which the plaintiff is entitled to have judgment and that said property be

sold by the commissioner appointed by this court and the proceeds applied upon said indebtedness."

The total amount alleged to be due on the notes is the sum first set forth of $87,186.60. In the prayer of the complaint the plaintiff demands judgment for said amount and that if the judgment be not paid within the time fixed by the court, that a commissioner be appointed to sell the aforesaid personal property under orders of the court and the proceeds thereof applied to plaintiff's indebtedness after first paying the commissioner for his services herein and other costs.

After some preliminary motions filed by defendant were disposed of, the defendant filed his answer on December 7, 1962, in which he denied that he was indebted to the plaintiff in the sum of $87,186.60, "or any other sums for which the plaintiff is entitled to judgment." The defendant specifically denies the allegations contained in numbered paragraphs 3, 4 and 5 of the complaint relative to the promissory notes. The defendant further alleged that the transaction between the parties involving the Benton property was usurious and therefore void; that plaintiff by its own conduct is estopped from claiming that "these notes are valid and is estopped from claiming there is any indebtedness due the plaintiff by reason of the Benton transaction."

On May 6, 1963, the case came on for trial, and following the opening statements of counsel for the plaintiff, the court granted plaintiff leave to file an amendment to its complaint, to which the defendant objected. By the amendment the plaintiff added an additional paragraph to its complaint and also amended the prayer of the complaint, as follows:

"8.

"The allegations of paragraphs three (3) and (4) of this Complaint, insofar as they rely upon the effectiveness of the notes and conditional sales contracts referred to therein, as binding legal contracts, are based

upon the decision and determinations made by this court in the case of Pellerin Laundry Machinery Sales Company, Inc., and Willis A. Pellerin v. J. M. Reed, et al., Civil Action No. 830. Should this court determine that said notes and contracts were never put into effect by agreement of the parties, plaintiff nevertheless alleges that a conditional sales agreement was entered between the parties for the equipment and property listed in said contracts at the basic price stipulated therein, title being retained by the plaintiff to secure the payment of said purchase price. Plaintiff hereby waives any right to sue on the two 'unaccepted' notes and contracts, as such, and elects with respect to the property listed in said contracts to ask for repossession of said property. That portion of the last sentence of paragraph three (3) and of paragraph four (4) which reads: 'and that the plaintiff is entitled to have said personal property sold by a commissioner of this court and the proceeds applied upon said indebtedness,' should be deleted from this Complaint.

"WHEREFORE, the plaintiff prays that it have judgment against the defendant upon the note and contract referred to in paragraph five (5) above and that if said judgment be not paid within a time fixed by the court, a commissioner be appointed to sell the personal property described in said conditional sales contract under orders of the court and the proceeds be applied to plaintiff's said indebtedness after paying the fees and costs. Plaintiff further prays for an order of this court giving to the plaintiff possession of the property described in the conditional sales contracts referred to in paragraph three (3) and four (4) above and that the defendant be ordered to forthwith account for and turn over said property to plaintiff; for its costs and all other proper relief."

The case proceeded to trial on the date set, May 6, 1963, but the plaintiff did not file the above amendment to the complaint until May 13 following the trial. Likewise, the defendant was given leave to file an answer to the amendment which he filed on May 20, 1963, following the trial. In the answer to the amendment the defendant, in addition to his original answer, specifically pleaded:

"(d) the Standard Laundry & Cleaners, Inc. of Benton, Arkansas, an Arkansas corporation, holds title to and is in possession of the equipment listed in Exhibits 'A', 'B' and 'C' to the original complaint of plaintiff in this action.

"(e) the aforesaid corporation is not a party to this action.

"(f) said business, including the said equipment, was located at Benton, Arkansas, before, during and after all negotiations between plaintiff and defendant regarding said sale.

"(g) said sale was made and consummated in Arkansas.

\* \* \* \* \* \*

"5. That defendant pleads surprise in that plaintiff's amendment to the original complaint was made orally in open court without any prior notice to defendant; that said amendment, in the nature of a replevin action, was filed without required replevin bond or affidavit of ownership in replevin having been filed in this action.

"6. That defendant specifically pleads (a) usury, (b) estoppel, (c) laches and (d) failure of consideration as affirmative defenses to plaintiff's complaint as amended.

"7. Defendant further pleads that plaintiff, in filing its original complaint in this action, made an election of remedies and is estopped by such election; that plaintiff's possessory action lies, if at all, in the Eastern District of Arkansas against said corporation.

\* \* \* \* \* \*

"11. That plaintiff, not having qualified to do business in Arkansas, is not qualified to maintain this action in this Court or in any Court having jurisdiction of defendant or of Standard Laundry and Cleaners, Inc. of Benton, Arkansas."

The plaintiff will be referred to hereinafter as either Pellerin or plaintiff and defendant as either Hogue or defendant.

The facts upon which the transaction between Pellerin and Hogue are based are not in serious dispute, and by stipulation of the parties in the instant case, finding of fact No. 7 by this court in the earlier case of Pellerin v. Reed, et al., Civil Action No. 830, Hot Springs Division, Pellerin Laundry Machinery Sales Co., Inc., v. Reed, (8 Cir. 1962) 300 F.2d 305, was adopted as the foundation on which the ore tenus testimony and other evidence in the instant case rests. From a consideration of all the facts and circumstances, the court finds that the transaction in question was brought about by the following sequence of events. In 1957 J. M. Reed, one of the principal parties in Civil No. 830, found it financially necessary to expand his laundry business in Hot Springs to Benton to enable him to process more of his Hot Springs volume. Accordingly, he purchased additional laundry equipment from Pellerin and executed a note in the amount of $46,552.80, secured by a conditional sales contract. Later in 1957 Reed needed additional dry-cleaning equipment and secured it from Pellerin and executed a note to Pellerin in the amount of $13,684.36, secured by a conditional sales contract.

In the early part of 1958 the Craighead Laundry, the largest of such establishments in Hot Springs was on the market for sale and Reed was interested in purchasing it. He discussed this purchase with Pellerin, but before he would be able to carry out such a transaction, it was imperative that he be free of his obligations in connection with the Benton Laundry. The decision of Reed and Pellerin was that the best way to handle

the situation would be to sell the Benton facility as a going business rather than attempting to sell individual pieces of equipment. It was agreed between Pellerin and Reed that Reed would sell this equipment to Pellerin and pay off any obligations owed by the Benton Laundry, and Pellerin agreed to sell and finance the complete laundry, and after the sale was consummated, to credit Reed's account for the personal property and the laundry conveyed by Reed to Pellerin and for his equity in the other machinery. As the court found in Civil Action No. 830, this transaction constituted a separate sale between Reed and Pellerin, and for the purposes of the instant case Reed dropped out of the picture at this point.

Pellerin attempted to secure a purchaser for this Benton laundry and approached Vernon Hogue, who had been a laundry operator in Hot Springs for several years and had had prior dealings with Pellerin. In July 1958, following several discussions between Pellerin and Hogue as to the details of the proposed Benton transaction, Hogue agreed to purchase the complete Benton plant for the sum of $60,880.05. On August 9, 1958, Pellerin mailed Hogue a letter containing the details of the transaction with which were enclosed three promissory notes, including the $17,793.75 note at issue, all of which were to be secured by conditional sales contracts also enclosed. The details of the transaction as contemplated between the parties at this time were contained in the following statement:

"Mr. Vernon Hogue
"Standard Cleaners-Laundry
"628 West Grand Avenue
"Hot Springs, Arkansas
"August 9th, 1958 Page Two
 "You will observe I have worked this out on a five year plan for you in order to keep the Note payments down, although we had originally discussed this on the basis of 48 months. There might be a kick back on this, however, it was worth the trial, even if it means partial financing on my part and with my pressure upon the finance companies. At any rate, the documents are drawn up on this basis, as you will note.

 "I direct your particular attention to the manner in which the documents enclosed are prepared to show an addition and then an equivalent deduction as Junk Trade-In to show a down payment in connection with each transaction, but resulting in each case to the actual amount of the Note.

 "I also direct your attention to the addition of $5,000.00 for working capital which is in excess of the amount of $3,500.00 originally discussed and for the purpose of making an adjustment for you with respect to the time when you will have to actually make your own first Note payments. As you will note, the documents are drawn to show the first Note payment due 60 days after date which is the maximum extent that the finance companies will agree to do. With the extra amount added for working capital, it is my intention to retain enough out of this to make payment of the first three installments for you, which will result in sending you an amount slightly in excess of $3,500.00 anyway. In this way you will, in effect, have the full benefit of a 90-day payment requirement before you actually start making the payments.

 "The documents enclosed must all be signed by you, on all copies, at point marked 'X'. Please also sign the three Notes at point marked 'X'.

 "It is my suggestion that you leave all the documents UNDATED, to be dated by me when the documents from Reed are received and the Bank has been paid.

 "It is my further suggestion that you do not take actual possession of the plant until I inform you all the documents are back in my possession, both from you and Reed, and the Bank has been paid. In this way, you will be fully protected, which I want to do to avoid a false start which could hurt you considerably in Benton.

"Please RUSH the three Notes and all copies of the Contracts back to me, fully signed as above indicated, and then sit tight until I inform you further.

"Best regards.

"Yours very truly,
"PELLERIN LAUNDRY
MACHINERY SALES
COMPANY, Inc.
"/s/ W. A. PELLERIN"

Hogue signed the three notes and conditional sales contracts and left them undated and returned them to Pellerin. Thereupon, Pellerin dated and negotiated the $17,793.75 note to the Inland Credit Corporation, and Pellerin also accepted by signing at that time the conditional sales contract which secured this note, to which was attached a full description of that part of the laundry machinery in the Benton plant which was covered by the contract securing the payment of the negotiated note. The other two promissory notes in the amounts of $49,616.87 and $14,949.43 have never been dated or negotiated by Pellerin, and the conditional sales contracts which were to secure them have not been accepted or otherwise executed by Pellerin.

Hogue has received the following consideration for the execution of his promissory note in the amount of $17,793.75, payable in 59 successive monthly installments in the amount of $296.56 to begin 60 days from August 20, 1958, and the final monthly payment of $296.71; equipment valued at $9,235.99, and $3,500.00 out of the $5,000.00 advancement of operating capital were paid to Hogue by three checks, the first in the amount of $1,000.00 paid August 20, 1958; the second in the amount of $1,000.00 paid August 23, 1958; and the third in the amount of $1,500.00 paid September 22, 1958. The remaining $1,500.00 was retained by Pellerin as a deposit in Hogue's name which could be drawn on by Hogue at any time for the monthly payments on the executed promissory note. As stated in Pellerin's letter dated August 9, 1958, the parties appeared to have contemplated all three promissory notes being executed on the same date with the payments of the first installments deferred up to 90 days on all three notes. However, these plans were changed when the finance company refused to accept a delay of more than 60 days on the payment of the first installments, and it was doubtful that Hogue could have begun paying on all three notes at one time until his Benton property became a going concern. Thus, the evidence shows that the parties, by mutual consent, altered this phase of their original agreement, and the $1,500.00 was to be used to meet the installments as they came due on the one note that was executed and negotiated, and Hogue was to have a one-year option during which time he was to assume the obligations as provided in the remaining two unexecuted notes and conditional sales contracts.

The evidence shows that on October 14, 1958, Pellerin paid the first installment of $296.56 on the $17,793.75 note to the Inland Credit Corporation, which amount was paid out of the $1,500.00 deposit. On December 19, 1958, Pellerin paid $1,000.00 out of the $1,500.00 deposit to Hogue at his request so that Hogue could meet the installments due on the $17,793.75 note. On February 16, 1959, Pellerin paid $297.12 out of the original $1,500.00 as an installment on the $17,793.75 note to the Inland Credit Corporation. These last three payments, which actually exceeded the original $1,500.00 deposit, were made at the request of Hogue and were paid either to Hogue personally as was the $1,000.00 check dated December 19, 1958, or were made directly to the Inland Credit Corporation as installments as were the checks dated October 14, 1958, and February 16, 1959. Pellerin paid a total of $1,593.68 to Hogue or his account out of the original $1,500.00 deposit that was to be drawn on by Hogue for the payment of his installments.

Since the expiration of the year's period following the transaction between these parties on August 9, 1958, their relationship has deteriorated in propor-

tion to Hogue's inability to satisfy his financial obligations to Pellerin and the Inland Credit Corporation on the $17,-793.75 note and to Pellerin on the open accounts with both Hogue's Hot Springs and Benton laundry operations. Hogue has attempted various devices to build up his Benton business to the point where he could assume the remaining obligations as was contemplated by the parties in their original transactions, including the taking in of a partner and the incorporation of his Benton enterprise, but these stratagems have been to no avail and all attempts between these parties to negotiate their differences have ended in failure.

With the issues as stated by the parties in the original complaint and the amendment thereto of plaintiff, the original answer and the amendment thereto of the defendant, and the facts relative to the transaction between the plaintiff and defendant, the court feels that it must determine by a consideration of the issues and facts and the applicable law the extent of the judgment which it should enter in the case.

The plaintiff is a corporation organized and existing under the laws of the State of Louisiana with its principal place of business at Kenner, Louisiana, and is not authorized to do business in Arkansas. The defendant is a citizen of Arkansas, and an actual resident of the City of Hot Springs in the Western District of Arkansas. The amount in controversy exceeds the sum of $10,000.00, exclusive of interest and costs.

The property which the plaintiff sold to defendant has been at all times, and is now, located in the City of Benton in the Eastern District of Arkansas. Since the original transactions between the plaintiff and the defendant, the defendant appears to have transferred all of the property to Standard Laundry and Cleaners, Inc., of Benton, Arkansas, an Arkansas corporation, which is now in possession of the property and which holds such title as the defendant Hogue could legally convey to it.

Title 28, U.S.C. § 1391(a) provides:

"A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside."

Section 1392(b) provides:

"Any civil action, of a local nature, involving property located in different districts in the same State, may be brought in any of such districts."

The defendant in the amendment to his answer has, in effect, attacked the jurisdiction of the court because the property is located in the Eastern District, and the possession of the property is presently vested in Standard Laundry and Cleaners, Inc., which is not a party.

The plaintiff in its original complaint alleged that it is entitled to have judgment for the face amount of each of the three notes, and "that the personal property be sold by a commissioner appointed by this court and the proceeds credited upon said indebtedness," but when the allegations contained in the amendment thereto are considered, it is clear that plaintiff is not seeking to recover the property which the $17,793.75 note and conditional sales contract cover in satisfaction of the indebtedness, but is seeking to have that property sold by a commissioner appointed by the court and the net proceeds of the sale applied to the indebtedness due on the $17,793.75 note.

As to the other two undated notes, one for $49,616.87 and the other for $14,-949.43, and the accompanying title-retaining contracts, the plaintiff in the amendment to the complaint definitely and conclusively waived its right to recover on the debts evidenced by the two undated notes when it alleged: "That portion of the last sentence of paragraph three (3) and of paragraph (4) which reads: 'and that the plaintiff is entitled to have said personal property sold by a commissioner of this court and the proceeds applied upon said indebtedness,' should be deleted from this Complaint."

Plaintiff prays only for judgment on the note and contract for $17,793.75, "and that if said judgment be not paid within a time fixed by the court, a commissioner be appointed to sell the personal property described in said conditional sales contract under orders of the court and the proceeds be applied to plaintiff's said indebtedness after paying the fees and costs."

Plaintiff then prays for "an order of this court giving to the plaintiff possession of the property described in the conditional sales contracts referred to in paragraphs three (3) and four (4) above and that the defendant be ordered to forthwith account for and turn over said property to plaintiff; for its costs and all other proper relief."

■ ■ Title 28 U.S.C. § 1391, fails to distinguish clearly between transitory and local actions, but despite the ineptness of the section, it applies only to transitory actions. A local action must be commenced in the district where the property is located, but where property is located in different districts in the same state, Sec. 1392(b) provides that the action may be brought in any of such districts. In the instant case the property is not located in different districts. It is only located in the Eastern District of Arkansas.

In 1 Moore's Federal Practice, 2d Ed., Venue, Sec. 0.142(2.–1), p. 1455, the learned author states:

"The true distinction between a local action and a transitory action is the distinction between an action in rem and one in personam. The character of the remedy sought should be determinative. If a plaintiff, asserting rights involving property, seeks a remedy in or to that property which requires the court to have jurisdiction over the res to afford the relief sought then the action is in rem and local. The property must of necessity be subject to the jurisdiction of a court having power and control over the res; and, since in rem service of process is all that is needed for the court to proceed, the venue

just stated is a practical one that permits of adjudication. A transitory action, on the other hand, is one in which the plaintiff seeks a personal judgment against the defendant; and, so far as jurisdiction is concerned, may be brought before any competent court having subject matter jurisdiction and in personam jurisdiction over the defendant."

Beginning on page 1457, the learned author further states:

"Illustrative examples of actions which are held to be local in nature are: in rem suit to determine title to property, including an action to quiet title or to remove a cloud on title; ejectment; foreclosure of a mortgage; enforcement of a vendor's lien; proceeding to cancel mortgage in connection with, or to annul sheriff's sale of realty; condemnation action under the power of eminent domain, or under a forefeiture statute; adjudication of water rights; a suit to set aside a transfer of specific property; and in rem actions involving property of a related nature."

The defendant in his answer denies that he is indebted to plaintiff in any sum, and more specifically in the amount as evidenced by the three promissory notes, but at the trial the defendant admitted signing the notes and admitted that the principal amount of the debt was $60,885.95 as of August 9, 1958. On that date the plaintiff prepared and sent to the defendant the three notes accompanied by title-retaining contracts to secure the payment of the principal and interest which defendant signed and returned. It will be observed that the notes were so drawn as to include the interest that was to accrue during the time allowed for payment.

■ Without doubt the venue is proper, and jurisdiction exists to adjudicate the strictly in personam questions involved, but the venue is not proper and jurisdiction does not exist to adjudicate the right of possession or to subject the property to a sale in satisfaction of the

amount found due on the $17,793.75 note, nor does the court have jurisdiction to award to plaintiff the possession of the property covered by the other two notes and the accompanying title-retaining contracts. "The character of the remedy sought should be determinative." Moore, supra.

Therefore, the court should only adjudicate what appears to be in personam issues, and will leave the plaintiff free to pursue in courts of competent jurisdiction such other actions as it may deem proper to obtain judgment on the $17,793.75 note and for the sale of the property covered by the note and contract and to obtain possession of the property covered by the other two notes and contracts in full satisfaction of the indebtedness evidenced by said two undated notes.

With the posture of the case as above stated, the court will proceed to determine the in personam issues, such as the alleged defenses of usury, laches, failure of consideration, and that the plaintiff by filing its original complaint made an election of remedies and is estopped by such election.

■ The court will first consider the defense of usury, which the defendant alleges voids the whole transaction in general and the promissory note for $17,793.75 in particular. According to the plaintiff's calculations, the consideration for this note was made up of $9,235.00 worth of equipment and the $5,000.00 advance in operating capital, which made a total principal of $14,235.00. The difference between this amount and the face amount of the note amounts to $3,558.75, which amount represents the interest. According to the tabulations contained in Lake's Monthly Installment and Interest Tables, 5th Ed., 1954, Part 1, the effective annual rate of interest to be paid by the defendant would amount to approximately 9 percent. The defendant's theory of this particular transaction is that the principal of the note amounted to only $12,735.00, that is, the total of the value of the equipment, $9,235.00, plus a $3,500.00 advance in operating capital. The difference between

this and the face value of the note is the amount of $5,058.75, which amount includes the $1,500.00 remainder out of the $5,000.00 that the plaintiff was to advance to the defendant as operating capital, which the defendant alleges he never received and was not made available to him. By the defendant's calculations, which are correct, this interest would exceed the allowable rate of 10 percent per annum, and would therefore be usurious under the law of Arkansas, and the defendant contends that the law of Arkansas on usury controls. However, it is the opinion of the court that no part of the $5,000.00 advance in operating capital was withheld from the defendant at any time, but rather it was deposited in his name and he could draw on it at any time. In fact, over an eight-month period Pellerin not only paid out this whole amount of $5,000.00 but paid out an additional $93.68.

The governing law on this point is found in 55 Am.Jur. Usury, Sec. 15, which states at page 334:

"If as a condition of making a loan the borrower is required to leave part of the money on deposit with the lender, the transaction is usurious if the interest paid for the loan amounts to more than legal interest on the sum actually available for the use of the borrower. If, however, the agreement for a loan contemplates that the entire amount shall be available to the borrower at once, the mere fact that he leaves a part thereof with the lender for a time, or that a brief delay in paying it over to him occurs, does not make the transaction usurious in the absence of a corrupt intent to evade the law against usury."

■ The fact that the total interest is to be paid in monthly installments along with the principal does not alter the validity of this transaction, as stated in 91 C.J.S. Usury § 30, at page 608:

"While there is some authority to the contrary, it is held in most jurisdictions that a contract or obligation to pay interest at the highest lawful

rate is not usurious by reason of a provision for the payment of such interest at intervals less than a year, such as semiannually, quarterly, or monthly, even though the statute fixes a maximum rate 'payable annually.' Similarly, a contract may, without being usurious, provide for the payment at specified intervals during a year of interest at a rate equal to a corresponding fraction of the highest lawful rate per annum; and, a fortiori, a contract for the deposit with a designated depositary at specified intervals during a year, of aliquot parts of the interest to become due at the end of such year at the highest lawful rate, is not usurious."

Although the court has determined that Hogue had been advanced the whole $5,000.00 as working capital as part of the consideration of the $17,793.75 note, and that the total of such advance would be allowable under either the law of Arkansas or Louisiana, the fact that the effective annual rate of interest falls between 8 and 10 percent necessitates the determination of whether the usury law of Arkansas or Louisiana should be applied. As stated above, the maximum rate of interest in Arkansas is 10 percent; and, as provided in Article 19, Section 13, of the Arkansas Constitution of 1874: "All contracts for a greater rate of interest than ten per cent per annum shall be void as to principal and interest, * * *." In Louisiana the maximum rate of interest which may be contracted is 8 percent. Where usury is established in Louisiana, only the interest in excess of 8 percent per annum is subject to forfeiture and the remainder is recoverable. Louisiana Rev.Civil Code, 1870, Sec. 2924. See, Osborne v. Mossler Acceptance Corp., 214 La. 503, 38 So.2d 151; Vosbein v. Leopold, 230 La. 21, 87 So.2d 715. Thus the court must decide under the law of conflicts of laws whether the rate of interest is susceptible to partial forfeiture under the law of Louisiana or no forfeiture under the law of Arkansas.

As heretofore stated, the note under consideration introduced as plaintiff's Exhibit No. 7 states on its face that it was executed by Hogue in the City of Benton, Arkansas, but it was left undated. The note also states that it is payable to plaintiff in New Orleans, La., and that the note was delivered by Hogue to Pellerin by mailing it from Benton to New Orleans. The evidence is also undisputed that the note was received in due course by Pellerin in New Orleans and negotiated by dating the note and endorsing it to the Inland Credit Corporation.

■ Since this note was executed in 1958, it is governed by the provisions of the Uniform Negotiable Instruments Law enacted in all 50 states and contained in Ark.Stat.Ann. § 68–101 et seq., (1957 Repl.). The fact that the promissory note in question was not dated at the time Hogue delivered it to Pellerin does not affect its validity and negotiable character. Ark.Stat.Ann. § 68–106 (1957 Repl.).

Ark.Stat.Ann. § 68–113 (1957 Repl.), provides:

"Where an instrument expressed to be payable at a fixed period after date is issued undated, or where the acceptance of an instrument payable at a fixed period after sight is undated, any holder may insert therein the true date of issue or acceptance, and the instrument shall be payable accordingly. The insertion of a wrong date does not void the instrument in the hands of a subsequent holder in due course; but as to him, the date so inserted is to be regarded as the true date."

Ark.Stat.Ann. § 68–116 (1957 Repl.), provides:

"Every contract on a negotiable instrument is incomplete and revocable until delivery of the instrument for the purpose of giving effect thereto. As between immediate parties, and as regards a remote party other than a holder in due course, the delivery, in order to be effectual, must be made

640

either by or under the authority of the party making, drawing, accepting or indorsing, as the case may be; and in such case the delivery may be shown to have been conditional, or for a special purpose only, and not for the purpose of transferring the property in the instrument. But where the instrument is in the hands of a holder in due course, a valid delivery thereof by all parties prior to him so as to make them liable to him is conclusively presumed. And where the instrument is no longer in the possession of a party whose signature appears thereon, a valid and intentional delivery by him is presumed until contrary is proved."

In Leflar, The Law of Conflict of Laws, 1959, Sec. 133, the author summarizes the generally accepted law rules governing the validity of bills and notes as follows:

" * * * The place of making a bill or note is that at which the instrument is first delivered to a taker for value. The weight of authority regards the law of the place of making as that which governs the general validity and effect of the instrument, though the holdings are confused by the fact that an instrument is often payable at the place where it is made, and when the question of validity turns upon the defense of usury or some other issue affected by local public policy, the same variety of rule is apt to be discovered as with other types of contracts."

See, also, Weiser National Bank v. Peters, (1927) 174 Ark. 984, 298 S.W. 878.

However, it appears that some courts have been uncertain in the choice of law rules when the question of usury enters the picture. As stated by Dr. Leflar in the 1959 edition of his work on the Conflict of Laws, Sec. 131:

"Some writers have set the usury cases apart from Conflict of Laws cases involving other aspects of the validity and effect of contracts, saying that the usury cases are a law unto themselves. They contend that the influence of local public policy on the choice of law problem, as exhibited in usury cases by the tendency to refer the validity of allegedly usurious contracts to any substantially connected law which will hold the contract valid or at least minimize the forfeiture, is peculiar to usury cases alone. That such a tendency exists is undeniable. But courts in handling usury cases do not announce that the Conflict of Laws rule which they apply is different from the standard rule, or rules, for contracts cases. They say that they are applying to the usury cases orthodox principles of the law of Conflict of Laws relating to contracts. It is submitted that this is correct. The usury cases seem in most states to be representative of what happens in the cases generally. The courts tend to apply the law of whatever state, substantially connected with the transaction, will sustain the contract, unless the contract somehow violates the forum's strong public policy."

■ Under the facts the court is of the opinion that Louisiana law controls the validity of the $17,793.75 note since it is undisputed that the note was delivered to Pellerin in New Orleans after having been executed in Arkansas, and the note is payable in Louisiana. The fact that there will be a partial forfeiture of the interest in excess of 8 percent is not so drastic as would compel this court to construe the Arkansas law as controlling in order to prevent any forfeiture at all.

■ The note is not void as being usurious, and if the plaintiff were authorized under the law to maintain a suit, the note would represent an enforceable obligation against the defendant in a court of competent jurisdiction, less the difference between the rate of interest actually calculated and the interest at 8 percent calculated on the note in the same manner and time.

■ The fact that Pellerin did not date the other two notes did not invali-

date the contract of defendant or his liability for the purchase price of the property covered by the said notes and contracts.

■ As to the other alleged defenses, laches, failure of consideration, election of remedies and estoppel, it is difficult to understand how the defendant has been damaged by the delay of plaintiff in commencing its suit. Pellerin is not seeking damages for the use of the equipment by Hogue for approximately five years. Hogue was not prejudiced by Pellerin's election not to accept the tendered conditional and title-retaining contracts on the equipment described in the $49,616.87 and $14,949.43 conditional sales contracts. Of course, it goes without saying that title to this equipment, having originally been conveyed by Reed to Pellerin, has remained in Pellerin at all times as against Hogue, his heirs, assigns, grantees and mortgagees.

■ There was no failure of consideration. The only one that has suffered damage is Pellerin. It has furnished Hogue and his associates equipment for five years without receiving any interest or rental.

The defendant has cited Crawford v. General Contract Corp., (W.D.Ark.1959) 174 F.Supp. 283; Union Motor Co. v. Tait, (1955) 224 Ark. 807, 276 S.W.2d 690; Brooks v. Superior Oil Co., (W.D. Ark.1951) 96 F.Supp. 641; Thomas Auto Co. v. Moody, (1944) 206 Ark. XIX, 177 S.W.2d 754; and Newbern v. Morris, (1961) 233 Ark. 938, 349 S.W.2d 662, in support of his contention that the plaintiff in commencing the suit made an election to take the property in satisfaction of the debt, and that plaintiff did not comply with the requirements of the law to bring a replevin suit, and if "plaintiff had complied with the requirements to bring a replevin action, the defendant would have had some security against which to proceed and against surprise." The court has heretofore analyzed the complaint and the amendment. Before the amendment was filed the plaintiff was seeking a judgment for the amount due on each of the three

notes and to have the property covered by each note sold separately by a commissioner and the purchase price, less the cost of sale, applied to the payment of the note. Plaintiff did not seek to repossess the property. Also, it should be noted that plaintiff asked that a receiver be appointed to take charge of the property and to report to the court as to its location and condition and to safely keep the property until it was sold by the commissioner. In other words, plaintiff did not seek to replevy the property under the title-retaining contracts. The possession of the defendant was left undisturbed. Upon the filing of the amendment to the complaint, the plaintiff did elect to repossess the property covered by the note for $49,616.87 and the note for $14,949.43 in full satisfaction of those notes, but the claim for judgment on the $17,793.75 note was left unchanged by the amendment.

■ The law in Arkansas is well settled by many decisions of the Supreme Court, and the federal courts have consistently followed them. The rights of persons under title-retaining contracts have been clearly defined. In Provance v. Arnold Barber & Beauty Supply Co., 218 Ark. 274, at page 276, 235 S.W.2d 970, at page 970, the court said:

" * * * Under its title retaining contract the seller had two remedies: It could replevin the property or it could sue on the debt. It had to elect—it could not do both.

"In the case of Nashville Lumber Company v. Robinson, 91 Ark. 319, 121 S.W. 350, 352, the Court said: 'When this debt became due and was unpaid, the vendor, having reserved the title until the purchase price was paid, had its election to take either of two courses: It could elect to retake the property, and thus in effect cancel the debt; or it could bring its action to recover the debt, and thus affirm the sale and waive reservation of title.'

" 'When the debt becomes due, the vendor, in sales of this character, may bring an action to recover the

debt, and by this he affirms the sale and waives the reservation of title; or he may elect to take the property and by doing so cancel the debt. He may not, however, have both remedies, and where he elects to retake the property, an action to recover on the debt is barred.' McCain v. Fender, 188 Ark. 1139, 69 S.W.2d 867, 868.

"In Laird v. Byrd, 177 Ark. 1114, 9 S.W.2d 571, 572, the Court stated: 'It is well settled in this State that one who sells personal property with reservation of title, upon the purchaser's default, may either treat the sale as cancelled and bring an action of replevin, or treat the sale as absolute and sue for the purchase money.'

"When appellee elected to sue on the debt in preference to filing suit to replevin the property, the sale was treated as absolute, and appellee was in the same position as it would have been if title had not been retained in the first place."

See, also, Brooks v. Superior Oil Co., (W. D.Ark.1951) 96 F.Supp. 641, at p. 646; Crawford v. General Contract Corp., (W. D.Ark.1959) 174 F.Supp. 283, at p. 302.

For the reasons hereinbefore stated, the court is of the opinion that the plaintiff cannot maintain this suit for the recovery of the possession of the equipment covered by the two notes, one for $49,616.87 and the other for $14,-949.43, with the accompanying title-retaining contracts. This applies also to the note for $17,793.75, since the plaintiff is seeking to subject the property covered by that note and title-retaining contract to sale by a commissioner to be appointed by the court and to have the proceeds of the sale applied as a payment on the judgment.

In the amendment to his answer, the defendant alleged: "That plaintiff, not having qualified to do business in Arkansas, is not qualified to maintain this action in this court or in any court having jurisdiction of defendant or of Standard Laundry and Cleaners, Inc., of Benton, Arkansas."

The defendant in his brief did not cite any authorities in support of the allegation. The only statement made by defendant is the following:

"The defendant did allege, among other affirmative defenses, that plaintiff was not qualified to bring this action as a foreign corporation because the facts in this case and in the Reed case substantiate the finding that plaintiff was doing business in Arkansas. If we look at the fact that Exhibits 'A', 'B' and 'C' to plaintiff's letter of August 9, 1958, contemplated that payments were to be made not in Louisiana and not in Arkansas but elsewhere by Hogue and if we look at the fact that plaintiff's letter of August 9, 1958, was written pursuant to a contract between the parties regarding property located in Arkansas, then clearly, plaintiff was doing business in Arkansas without being a legal entity in Arkansas to do so."

In the reply brief of plaintiff, the only reference made to the contention is the following:

"The defendant cites no authority with respect to its [his] contention that the plaintiff is not authorized to bring this action because not qualified in Arkansas as a foreign corporation. This court's own decision would indicate that there was no substantial basis for such an argument, anyway. See Pratt Laboratories, Inc., v. Teague, (W.D.Ark. 1958) 160 F.Supp. 176."

The defendant did not file a motion to dismiss, but the court believes that the contention must be considered and determined notwithstanding the failure of the defendant to support his contention by citation of authorities. This has forced the court to independently investigate the law applicable to the undisputed facts.

Mr. William A. Pellerin, the President of the plaintiff, testified that the plaintiff

is engaged in selling and manufacturing laundry machinery; that he, his son, and Mrs. Pellerin, are the only stockholders of the plaintiff corporation; that the plaintiff was incorporated in January 1958 in the State of Louisiana; that it has not been incorporated in any other state nor has it qualified to do business in any other state.

Thus, the plaintiff is a foreign corporation and has not qualified under the law of Arkansas to engage in business in Arkansas.

Sec. 64–1201, Ark.Stat.Ann., (1957 Repl.), provides:

"Every company or corporation incorporated under the laws of any other State, territory, or country, * * * now or hereafter doing business in this State, shall file in the office of the Secretary of State of this State a copy of its charter or articles of incorporation or association, or a copy of its certificate of incorporation, duly authenticated and certified by the proper authority, together with a statement of its assets and liabilities and the amount of its capital employed in this State, and shall also designate its general office or place of business in this State, and shall name an agent upon whom process may be served. * * * "

Sec. 64–1202 provides:

"Any foreign corporation which shall fail to comply with the provisions of this act and shall do any business in this State, shall be subject to a fine of not less than $1,000, to be recovered before any court of competent jurisdiction, and all such fines so recovered shall be paid into the general revenue fund of the county in which the cause of action shall accrue, and it is hereby made the duty of the prosecuting attorneys to institute said suits in the name of the State, for the use and benefit of the county in which the suit is brought, and such prosecuting attorney shall receive as his compensation one-fourth of the amount recovered, *and as an additional penalty, any foreign corporation which shall fail or refuse to file its articles of incorporation or certificate as aforesaid, cannot make any contract in the State which can be enforced by it either in law or in equity, and the complying with the provisions of this act after the date of any such contract, or after any suit is instituted thereon, shall in no way validate said contract.*" (Emphasis added.)

 Without doubt the contract for the sale of the equipment was entered into in Arkansas. Mr. Pellerin, the President of plaintiff, negotiated the contract with defendant in Arkansas. The equipment was at that time and still is located in Arkansas. After the plaintiff had agreed to sell and the defendant to buy the property, the contract was finalized by preparing the title-retaining contracts, which were mailed by Pellerin to the defendant and which were signed by the defendant in Arkansas. The sale was not an interstate transaction. The fact that the contract of sale was later reduced to writing does not destroy or alter the intrastate character of the contract. It is unnecessary for the court to review the various and many decisions of the Supreme Court of Arkansas which construe the statutes involved. In Hicks Body Co., Inc., v. Ward Body Works, (8 Cir. 1956) 233 F.2d 481, the court thoroughly considered the decisions of the Supreme Court of Arkansas in connection with the issue involved here. The court held that the statutes do not make such contracts void, but "merely leaves the corporation without the right or capacity to enforce such a contract in the courts of the State."

 "And, since Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, any such disability on the part of a non-complying foreign corporation to make use of a remedy existing under state law must, of course, be recognized by a federal court in its exercise of diversity jurisdiction. Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524."

At page 489 of 233 F.2d the court further said:

"We read the Arkansas cases, as we have indicated, to hold prevailingly that a contract made in Arkansas by a nonqualifying foreign corporation, involving the doing of business in that State, is not as such an illegal bargain but is merely an obligation on which the corporation will not be permitted to bring suit in the State. Thus, in Woolfort v. Dixie Cotton Oil Co., 77 Ark. 203, 91 S.W. 306, 307, the Arkansas Supreme Court, quoting with approval from a New Jersey decision, said: ' "The tendency of judicial decisions on this subject, where the statute does not declare the contract to be void, is to a strict construction, maintaining the validity of the contract and holding that the only effect of such legislation in the state where it is enacted is to impose the prescribed penalties and the expressed disabilities." '

"The Arkansas Legislature has reenacted the statute a number of times since this interpretation of the language used was first made by the Arkansas Supreme Court, but it has never seen fit to change the expression so as to declare such a contract to be void.

"It is true that the opinion in Republic Power & Service Co. v. Gus Blass Co., 165 Ark. 163, 263 S.W. 785, 787, uses the words 'absolutely void' in referring to such a contract, but as we pointed out in Brace v. Gauger-Korsmo Const. Co., 8 Cir., 36 F.2d 661, 663, in not regarding the expression of that case as intended to change the Court's previous, specific holdings on the question and the law which thereby clearly had been established, 'It is observed that this case makes no mention of the prior decisions in Arkansas, and does not purport to overrule them * * *.' The Arkansas Supreme Court has not since the Brace case said anything which suggests, and nothing that has been urged before us tends

otherwise to persuade, that the appraisal which we made in the Brace case was erroneous.

"Unless the statute was intended to make such contracts void, so that foreign corporations could not sue upon them either in Arkansas or in another State (where it might be possible to obtain service) and so that Arkansas citizens also could not ask to have them enforced against the corporation, there is no basis to regard the contract here as constituting an 'illegal bargain', in the sense of being within the application of the general rule that 'A party to an illegal bargain can neither recover damages for breach thereof nor, by rescinding the bargain, recover the performance that he has rendered thereunder or its value * * *'. Restatement, Contracts, Sec. 598.

* * * * * *

"But what we have said only emphasizes and leaves controlling the view taken by us in the Brace case, supra, that, under the decisions of the Arkansas Supreme Court, the statutory provision here involved was not intended to make a contract by a non-qualifying foreign corporation, entered into in the State, absolutely void, but merely subject to a disability on the part of the corporation to maintain a suit upon it, as a contract, in the courts of Arkansas. Appellant thus would be in a position to make a rescission of the contract, if it chooses, upon the basis of appellee's repudiation of it, and so to seek restitution from appellee of the machinery and equipment which it turned over, or the value thereof, in case appellee wrongfully is not in a position to make proper restoration, having regard, however, for the use which appellee was entitled to make of it in the bodies actually produced for appellant under the contract.

"We need not here, however, consider the question of restitution further. Since, as we have held, the

contract is not void, and since appellant is here asserting and standing upon the obligation of the contract, the situation is without basis for the question of restitution to be presently involved. Until appellant shall have elected to rescind the contract, so as not to leave it any basis for a suit against appellee thereon in another State, it is without any possible right to restitution. When it makes such an election and releases appellee from the obligation of the contract, it can have its right to restitution determined. There is no need to keep the present suit open to allow it to make up its mind and to enable it to file an amended complaint, should it decide to permit the contract to be rescinded. * * *"

Subsequent to the decision in the Hicks case, this court had occasion to consider the question in Pratt Laboratories, Inc., v. Teague, (W.D.Ark.1958) 160 F.Supp. 176, and after discussing the various phases of the question, the court stated: "Since the Court cannot determine from the present record whether the transactions upon which the note is based [are] interstate, intrastate, or both in nature, defendant's motion to dismiss must be overruled, and an order to that effect is being entered today." In the instant case the facts disclose that the contract upon which the notes in suit were based was an intrastate transaction.

In Arkansas Airmotive Division of Currey Aerial Sprayers, Inc., v. Arkansas Aviation Sales, Inc., (1960) 232 Ark. 354, at page 358, 335 S.W.2d 813, at page 816, the court reversed the decision of the trial court which had sustained a motion for summary judgment for defendant, and stated:

"Secondly, at this stage of the litigation it cannot be declared with certainty that the appellant will necessarily be compelled to rely upon the conditional sales contract. A foreign corporation, even though unlicensed, is nevertheless permitted to bring suit to protect its property as long as the suit does not unavoidably involve the enforcement of a prohibited contract. Fletcher, Cyclopedia of Corporations (Perm. Ed.), § 8796. Quite obviously a corporation's failure to qualify to do business should not have the effect of enabling third persons to misappropriate its property with impunity."

In an effort to maintain the instant suit, the plaintiff has relied upon the intrastate contract for the sale and purchase of the property, but as held by the Court of Appeals in Hicks, supra, and the Supreme Court of Arkansas in Arkansas Aviation Sales, Inc., supra, a foreign corporation, even though unlicensed, is nevertheless permitted to bring suit to protect its property as long as the suit does not unavoidably involve the enforcement of a prohibited contract. In other words, a corporation's failure to qualify to do business in the state should not have the effect of enabling third persons to misappropriate the corporation's property with impunity.

The question of restitution is not involved at this time since the plaintiff is here asserting and standing upon the obligation of the contract. Until plaintiff shall have elected to rescind the contract so as not to leave it any basis for a suit against defendant thereon in another state, it is without any possible right to restitution. When it makes such an election and releases defendant from the obligation of the contract, it can have its right to restitution determined in a court of competent jurisdiction.

For the reasons hereinbefore set forth, an order is being entered today dismissing the complaint of the plaintiff and amendment thereto without prejudice to its right of election to make rescission of the contract and institute action for whatever restitution it may legally be entitled to claim.